**WOODNICK LAW, PLLC**
1747 E. Morten Avenue, Suite 205
Phoenix, Arizona 85020
Telephone: (602) 449-7980
Facsimile: (602) 396-5850
Office@WoodnickLaw.com

Gregg R. Woodnick, #020736
Markus Risinger, #031524
*Attorneys for Petitioner*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

**AHMED ELKHAIAT**
121 Ford Street, Unit 109
M6N 3A2
Toronto, Ontario, Canada

Petitioner

v.

**NORA MAWASHI**
22803 E Stacey Road
Queen Creek, AZ 85142
(Assumed Address)

Respondent.

Case No.: _____

**VERIFIED PETITION FOR RETURN OF CHILD TO CANADA AND ISSUANCE OF SHOW CAUSE ORDER**

Assigned to Hon. _____

Under the Convention on the Civil Aspects of International Child Abduction, done at The Hague on October 25, 1980; International Child Abduction Remedies Act, 22 U.S.C. 9001 *et seq*.

**INTRODUCTION**

1. This Verified Petition for Return of Child (the "Petition") results from the wrongful removal and retention of the parties' one-year-old daughter, L.E., from her place

-1-

of habitual residence in Toronto, Ontario, Canada to the United States of America. The wrongful removal took place on or around August 9, 2024.

2. The Petitioner, Ahmed Elkhaiat ("Father"), a.k.a. Ahmed Elkhayat, is L.E.'s biological father. Father is a Canadian citizen.

3. The Respondent, Nora Mawashi ("Mother") is L.E.'s biological mother. Mother is a Canadian citizen.

4. Father and Mother have been married since 2021.

5. L.E. was born in Arizona and is a dual citizen of Canada and the United States of America. L.E.'s habitual residence is in Toronto, Ontario, Canada. Prior to wrongful removal, she was in Arizona for one month following her birth and approximately one month to visit her maternal grandparents, who own a seasonal home in Arizona. Aside from those temporary visits, L.E. resided at all times in Ontario, Canada with both parents.

6. Father brings this Petition under the Convention on the Civil Aspects of International Child Abduction, done at the Hague on October 25, 1980[1] (the "Hague Convention" or "Convention"), and the International Child Abduction Remedies Act[2] ("ICARA") implementing the Hague Convention.

7. The United States of America adopted the Convention on July 1, 1988 and partnered with Canada under the Convention on the same date.

---

[1] T.I.A.S. No. 11,670 at 1, 22514 U.N.T.S. at 98, *reprinted* 51 Fed. Reg. 10493 (1986).
[2] 22 U.S.C. 9001 *et seq*.

8. The purposes of the Convention and ICARA are to secure the prompt return of children who have been wrongfully removed or retained from their place of habitual residence.

## JURISDICTION

9. This Court has jurisdiction under 22 U.S.C § 9003 because this case involves the wrongful removal and retention of a child under age 16 from her habitual residence in Canada, a partner state under the Convention (federal question jurisdiction).

10. L.E. and Mother are currently located in Maricopa County, Arizona, within the jurisdictional boundaries of the District of Arizona.

11. Notice is hereby provided that Father's claims rely, in part, upon foreign law. Fed.R.Civ.P. 44.1.

## BACKGROUND FACTS

12. Father moved to Toronto, Ontario, Canada in 2015 to attend the Schulich School of Business. Prior to residing in Canada, Father lived with his family in Egypt.

13. Mother moved to Canada in approximately 1996 (at age 9) from Iraq.

14. Father and Mother (the "Parties") met in Toronto, Ontario, Canada in Fall 2016 and began a relationship shortly thereafter. At all times during their relationship and marriage, they permanently resided and worked in the Toronto area.

15. Mother owns a condominium in downtown Toronto and resided therein until the parties married in May 2021.

16. The Parties married in Toronto on May 15, 2021. The Parties continued to reside and work in Toronto after marriage.

17. The Parties have one child in common, L.E., born May 26, 2023.

18. Before L.E.'s birth, Mother worked as a marketing manager for Vish Limited, a software company in Toronto. Father worked as a business strategist for the Canadian International Bank of Commerce ("CIBC"), a multinational banking and financial services corporation.

19. Mother's parents (L.E.'s maternal grandparents) own real property in Toronto and Arizona. The maternal grandparents seasonally reside in Queen Creek, Arizona and Owen Sound, Ontario.

20. In May 2023, before L.E.'s birth, Mother decided to take maternity leave and deliver L.E. in Arizona to take advantage of support from her parents.

21. L.E. was born at the Dignity Health Mercy Gilbert Medical Center in Gilbert, Arizona and resided with Mother in Queen Creek for one month.

22. One month after L.E.'s birth, Mother and L.E. returned to Toronto and resided together with Father. Pre-dating wrongful removal in August 2024, L.E. has at all times lived and resided in Ontario, Canada except for one month in Arizona immediately after her birth and a visit to Arizona in March/April 2024.

23. In October 2023, Mother visited her parents in Owen Sound, Ontario. After returning home, she informed Father she wanted to apply for an artificial intelligence program at Arizona State University. This was the first time Mother expressed an interest in leaving her current field. At that time, Mother was employed full-time and had a successful career in marketing, while Father was employed on a temporary contract with CIBC. L.E. was five months old. Father was not interested in relocating outside of Ontario or either

-4-

party abandoning their current careers. Mother indicated that the first deadline to apply for the program was that same month. She did not apply at that time.

24. On December 1, 2023, the Parties signed a one-year lease for an apartment in downtown Toronto. Prior to signing the lease, Mother represented to Father that she intended to continue residing with him in Toronto.

25. In February 2024, Mother restated to Father that she was interested in pursuing the artificial intelligence program in Arizona. She represented that the program would be for two semesters—approximately nine months—and required in-person attendance in Tempe. Father suggested Mother consider analogous programs in the Toronto area. After the conversation, Mother applied to multiple programs in the Toronto area, including one at the University of Toronto and one at Queen's University in Kingston, Ontario. Based on Mother's representations and conduct, Father believed Mother would remain in Ontario for graduate school.

26. On or about March 10, 2024, Mother took a pregnancy test and learned she was pregnant. On March 11, Mother and L.E. traveled to Arizona to visit Mother's parents. Father signed an express written travel consent authorizing Mother to bring Lily to Arizona from March 11 to April 19, 2024. Father could not accompany them because of work commitments. Mother was still on maternity leave at this time and scheduled to return to work in May 2024.

27. During Mother's time in Arizona, she attended an appointment with her OBGYN. Sadly, the pregnancy was confirmed but not viable. Mother and L.E. returned home to Toronto on April 19, 2024.

-5-

28. In April 2024, Mother received acceptance letters from Queen's University in Ontario and Arizona State University for their respective programs. The Parties resumed their conversation about Mother attending the Arizona State program versus the program in Ontario. The Parties discussed childcare options, finances, etc. in comparing the two options. Ultimately, because neither of the Parties can work in the United States—they are not citizens and would have to apply for visas—relocation to Arizona was not practical or reasonably possible. Father did not consent to relocation during these conversations or anytime afterward.

29. On or around May 26, 2024, Mother left the Parties' home in Toronto to travel to Owen Sound, Ontario with L.E. for a pediatrician appointment and to visit Mother's parents. Father consented to Mother and L.E. remaining in Owen Sound until June 8, 2024.

30. Beginning in February 2024, the Parties planned a trip to Cairo, Egypt to visit Father's parents. Father had not seen his family in over two years, and they had not yet met L.E. The Parties applied for a travel visa for Mother and received approval in early June. They booked business class tickets for a July 20 flight to Cairo. However, Mother's passport was lost in the mail pending return from the Egyptian embassy. Around the same time, Father also learned CIBC would not renew his contract or offer him full-time employment.

31. On June 7, Father called Mother to discuss the various "bad breaks" the Parties had recently experienced, including the missing passport, Father's non-renewed contract with CIBC, etc. The Parties expressed mutual frustration at the situation, but the maternal grandmother overheard part of the conversation and began arguing with Father over the phone.

32. On June 8, Mother called Father and said she would be remaining in Owen Sound for an additional week and return home to Toronto on June 15. Father agreed and, at this time, had no major concerns about the situation. He spoke with Mother and saw L.E. daily—via videoconference—between June 8 and June 14. In the interim, Mother's passport and Egyptian visa were located and returned.

33. On June 15, Mother messaged Father and said she and L.E. were returning to Ontario as planned. Unknown to Father, the maternal grandfather also came to the Parties' apartment. Mother and the maternal grandfather informed Father that Mother was only there to pick up some belongings and would return to Owen Sound for "a couple of weeks" to clear her mind. Father was confused, but Mother claimed that this was a temporary trip and that she would return in two weeks. Given the unfortunate events occurring in the prior few months, Father did not object to her returning to Owen Sound.

34. Father gave Mother her passport and Egyptian visa during this interaction. Father had every reason to believe the Parties and L.E. would still be traveling to Egypt together in July. However, just before leaving the apartment, Mother told Father she applied for a dependent visa (F-2) that would allow L.E. to accompany Mother to Arizona under her student visa (F-1). At that time, Father was not aware Mother accepted admission to the Arizona State program, and he had no knowledge of the U.S. visa applications whatsoever.

35. Later that day, Father messaged Mother to reiterate that he was committed to her, their marriage, and their family together. Mother replied that Father knew where they were (in Owen Sound) and could visit at his discretion. For the next several weeks, Father continued to communicate regularly with Mother and L.E. by phone and video out of

respect for Mother's desire for time and space. Mother repeatedly postponed her return to Toronto.

36. On July 17, the Parties agreed that Mother and L.E. would soon return to Toronto. On July 18, now a full month after Father last saw Mother or L.E. in-person, Mother told Father she was on her way to Toronto and asked him to meet her at a park instead of their apartment. Father agreed and met them at Victoria Park. After about thirty minutes, Mother picked up L.E. and told Father she did not want to go to Egypt and would be returning to Owen Sound instead of returning home with him. Before Mother left, Father told her he objected to L.E. leaving Toronto other than to retrieve belongings from Owen Sound. He also expressly stated he did not consent to L.E. traveling to Arizona and expected her to remain in the Toronto area. On July 19, Father called Mother and made the same representations.

37. On July 20, Father reluctantly proceeded to the airport for the flight to Cairo (that the Parties began planning in February). Father hoped Mother would change her mind and waited until just a few hours before the flight to cancel the tickets for Mother and L.E. Before boarding, Father messaged Mother to ask when she would return to Toronto. He volunteered to return early from the trip to spend time with Mother and L.E. and work on their now-imperiled relationship. Over the next few days, he repeatedly messaged Mother about reconciliation and stated in certain terms that he did not consent to L.E. leaving the Toronto area.

38. On or about July 23, while Father was in Egypt, Mother's parents called Father's parents to discuss the Parties' relationship issues. Mother's parents indicated they

would bring Mother and L.E. back to Toronto and support the Parties attempting to reconcile. She asked when Father would return to Toronto. Father made arrangements to return on August 11.

### REMOVAL FROM CANADA AND SUBSEQUENT EVENTS

39. On August 9, while Father was en route to the airport to return from Egypt, Mother messaged Father the following:

> *I am currently in Arizona. Unfortunately, I had to leave early for my school program instead of my initial plan of leaving on Aug 16th. If you want to stop by to see us, we are temporarily living at 6831 E Beverly Ln Scottsdale, AZ, zip code: 85254. Hope to see you soon.*

40. Through Mother's message on August 9, Father learned for the first time that Mother had removed L.E. from Canada and brought her to Arizona. Father never consented to L.E. being removed from the Toronto area. In fact, Father expressly stated, both verbally and in writing, that he did not consent to L.E. being taken outside the Toronto area.

41. Upon information and belief, Mother's parents requested Father's travel information and proposed bringing Mother to Toronto to attempt reconciliation under false pretenses (to ensure Mother could remove L.E. from Canada to Arizona before Father returned).

42. Since learning Mother brought L.E. to Arizona on August 9, 2024, Father has made every reasonable effort to convince Mother to voluntarily return the child to her home in Toronto. Mother refuses.

43. On September 11, Father filed a Hague Convention application with the Canadian Central Authority for L.E.'s return. Upon information received from the Central

Authority, they contacted Mother and gave her a deadline of October 11 to return L.E. to Toronto. She did not return the child. Instead, she made material misrepresentations to the Central Authorities of the United States and Canada, including saying that Father consented to her bringing L.E. to Arizona and that he had not been in contact with her since then.

44. On September 16, an Ontario family law attorney, Surabhi Pathak, sent Father a letter advising that Mother has relocated to Arizona and intends to reside here permanently with L.E. Since that time, Mother has responded to Father's outreach for updates and communication with L.E. by directing him to speak to her lawyer.

45. On October 8, Father applied to the Superior Court of Justice in Ontario, Canada for dissolution of marriage and determination of legal decision-making responsibility and parenting time under the Divorce Act and Children's Law Reform Act of the Revised Statutes of Ontario.

46. As of October 15, the Central Authorities have proposed mediation and appear not to be taking any further action to remedy the wrongful removal.

**CHILD'S CURRENT LOCATION**

47. Upon information, Mother and L.E. are currently located at 22803 E. Stacey Road, Queen Creek, AZ 85142. Mother's parents, Sahib Mawashi and Kifah Majid, purchased this property on or about August 1, 2024. Mother's brother, Ali Mawashi, owns the adjacent property at 22799 E. Stacey Road, Queen Creek, AZ 85142.

48. Mother and L.E. may also be located at 6831 E. Beverly Lane or 6918 E Sandra Terrace, Scottsdale, AZ 85254. Mother's brother, Ahmed Mawashi, owns both properties.

49. All the above addresses are in Maricopa County, Arizona and within this Court's jurisdiction.

## ADDITIONAL JURISDICTIONAL FACTS

50. Father is the natural and legal father of L.E. and is entitled to all rights appertaining to parentage of a child under international law, the laws of Canada and the United States, and the laws of the State of Arizona.[3] Father's rights naturally exist, are observed by operation of law, and are effective at all times during the child's minority without an order being entered by any court.

51. Father did not consent to L.E.'s removal from Canada or retention in the United States.

52. There are no known court orders entered by any court anywhere in the world relating to the parties' respective rights concerning L.E.

53. At all times since L.E.'s birth, Father has enjoyed the rights of a legal parent.

54. Mother's actions have wrongfully deprived Father of his rights as to L.E., including his rights of association, access, custody, legal decision-making, parenting time, upbringing, and all other rights and responsibilities appertaining to the status of a legal parent.

55. Under Article 5 of the Hague Convention and 22 U.S.C. § 9002, Father is entitled to apply for the return of his child who was wrongfully removed from Canada and is

---

[3] 22 U.S.C. § 9001 *et seq.*; *Children's Law Reform Act*, R.S.O. 1990, Ch. C.12, § 20; *Troxel v. Granville*, 530 U.S. 57 (2000); A.R.S. § 25-401 *et seq.*

being wrongfully retained in the United States and to organize and secure the effective exercise of rights of access to the child.

56. At the time of Mother's removal of the child from Canada and retention in the United States, Father was actively exercising his rights within the meaning of the Convention because he was the child's father, resided with the child, cared for the child, supported the child, and actively participated in all aspects of the child's life.

57. Mother removed L.E. from Canada and retains her in the United States, without consent or legal authority, in violation of international law.

58. For purposes of the Convention, "wrongful removal or retention" includes removal of a child before the entry of a custody order regarding that child. 22 U.S.C. § 9003(f)(2).

59. Father has timely taken all legal steps available to him to secure return of the child to Canada and requested voluntarily return by Mother to no avail.

60. Father's Petition is made less than one year from the date of L.E.'s wrongful removal from Canada and wrongful retention in the United States.

**COUNT I – ARTICLE 18/§ 9003 RETURN**

61. Father restates all prior sections of the Petition as if fully repeated here.

62. This Court has concurrent original jurisdiction over all actions arising under the Convention. 22 U.S.C. § 9003(a).

63. Under the Hague Convention and ICARA statutes, Father petitions this Court to order the immediate return of L.E. to her habitual place of residence in Toronto, Ontario, Canada. 22 U.S.C. § 9003(b). This Court shall decide the case in accordance with the

Convention and enter orders concerning the child because she is located in its jurisdiction at the time the Petition is filed. *Id*.

64. By the allegations stated in this Petition, Father has established a prima facie case, by preponderance of evidence, that L.E. has been wrongfully removed from Canada and wrongfully retained in the United States. 22 U.S.C. § 9003(e)(1)(A).

65. Therefore, Father requests an order immediately requiring the return of L.E. to his care in Ontario, Canada.

66. Father has incurred reasonable and necessary attorney fees, expenses, and costs resulting from Mother's wrongful removal and retention of the child.

67. Father will continue to incur fees and costs, potentially including travel costs for himself and the child, resulting from Mother's wrongful removal and retention of the child.

68. In accordance with 22 U.S.C. § 9007(b)(3), Father requests an award of all reasonable and necessary attorney fees, expenses, and costs in conjunction with the order to return L.E. to Canada upon entry of such order and filing of a separate application for fees, expenses, and costs under this Court's procedural rules.

**COUNT II – ARTICLE 7/§ 9004 PROVISIONAL REMEDIES**

69. Father restates all prior sections of the Petition as if fully repeated here.

70. In furtherance of the objectives of Article 7(b) and other provisions of the Convention, this Court may take or cause measures under federal or state law to protect the well-being of the child involved or to prevent the child's further removal or concealment before final disposition of this Petition. 22 U.S.C. § 9004(a).

71. Unless this Court takes expedited action, irreparable harm will occur to Father and L.E. in that they will continue to be deprived of access to one another.

72. Irreparable harm will also occur if Mother further removes or conceals the child to avoid application of the Convention and the remedies set forth therein. Mother has refused all requests to voluntarily return the child to Canada and has engaged in an escalating pattern of limiting Father's communication with the child and concealing information about the child from Father.

73. Father does not know Mother's exact whereabouts as of the date of this Petition; however, he believes she can be located at one of the following locations (in order of likelihood):

   a. 22803 E. Stacey Road, Queen Creek, AZ 85142;

   b. 22799 E. Stacey Road, Queen Creek, AZ 85142;

   c. 6831 E. Beverly Lane, Scottsdale, AZ 85254; or

   d. 6918 E. Sandra Terrace, Scottsdale, AZ 85254.

74. Father is concerned Mother may be concealing her exact location from Father.

75. Therefore, Father requests the following immediate relief:

   a. Issue an Order to Show Cause requiring Mother to appear in this Court at the earliest available date;

   b. Direct the United States Marshals Service to serve the Order to Show Cause on Mother and immediately take into safe-keeping all the child's passports and other travel documents to prevent further removal;

    c.   Order Mother to transport the child to Father in Toronto, Ontario, Canada or produce the child at a date and time certain so that Father may transport the child.

## STATE LAW COMPLIANCE

76. Under 22 U.S.C. § 9004(b), this Court may not order a child removed from a person having physical control of the child unless applicable requirements of state law are satisfied.

77. Arizona adopts the Uniform Child Custody Jurisdiction and Enforcement Act ("UCCJEA") governing both domestic and international child custody disputes. A.R.S. § 25-1001 *et seq*.

78. Under Arizona law, this Court may order a party or any person having physical custody or control of the child to appear in person, with or without the child, and enter any orders necessary to ensure the safety of the child and of any person ordered to appear under A.R.S. § 25-1040. This Court has the authority to order the requested relief under all applicable provisions of the UCCJEA.

79. A court of the State of Arizona may enforce an order for the return of a child made under the Hague Convention as if it were a child custody determination (i.e., the applicable legal provisions and remedies herein are non-exclusive and non-conflicting with state law for purposes of 22 U.S.C. § 9004(b)). A.R.S. § 25-1052.

80. Mother and L.E. are currently located in Maricopa County, Arizona.

81. Both Father and Mother are the child's legal parents according to the child's birth certificate and marital presumptions. *See* A.R.S. § 25-901 *et seq*.

82. Father is not aware of any proceeding concerning the child except this Petition and his application filed in Ontario, Canada. No other court or jurisdiction has exclusive authority, nor are the remedies Father requests in this Petition in conflict with any state or international law. *See* A.R.S. § 25-402.

83. Father is not aware of any other person or institution not a party to this proceeding with any claim of rights or access to the child nor any exclusive authority or primacy as to the child that is not consistent with the Convention.

84. Pursuant to 22 U.S.C. § 9003(c), the parties will be given notice of any hearing in accordance with the Convention and the UCCJEA.

## RELIEF REQUESTED

**ACCORDINGLY**, Father requests the following relief:

A. An Order granting this Verified Petition for Return of Child to Canada;

B. An immediate Order to Show Cause scheduling a hearing at the earliest available date and requiring Mother to appear in person and show cause, if any, that this relief should not be granted;

C. An Order directing the United States Marshals Service to assist in locating Mother and serving upon her the Order to Show Cause, this Petition, and any other necessary papers;

D. An Order directing the Parties to return L.E. to Canada into Father's care by whatever means this Court determines is most appropriate;

E.  Upon granting the return of the child and all other relief deemed necessary or appropriate, an Order granting Father leave to file an application for attorney fees, expenses, and costs in compliance with this Court's procedural rules;

F.  Any other relief necessary to further the purposes of the Convention, ICARA, and Father's Petition whether or not expressly stated herein.

**RESPECTFULLY SUBMITTED** this 15th day of October 2024.

**WOODNICK LAW, PLLC**

Markus Risinger
Gregg R. Woodnick
*Attorneys for Petitioner*

**ORIGINAL** of the foregoing filed this 15th day of October 2024 with:

Clerk of the Court
United States District Court

**COPY** of the foregoing to be served upon:

Nora Mawashi
22803 E Stacey Road
Queen Creek, AZ 85142
*Respondent*

By: */s/ Eva Perez*

# VERIFICATION

I **AHMED ELKHAIAT**, declare under penalty of perjury that I am the Petitioner in the above-captioned matter; that I have read the foregoing *Petition for Return of Child to Canada and Issuance of Show Cause Order* and I know of the contents thereof; that the foregoing is true and correct according to the best of my knowledge, information and belief; and as to those things stated upon information and belief, I believe them to be true.

DocuSigned by:

*Ahmed Elkhaiat*
E054202E5B8446B...
_____
**AHMED ELKHAIAT**

10/15/2024
_____
Date