**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Ahmed Elkhaiat,<br><br>    Petitioner,<br><br>vs.<br><br>Nora Mawashi,<br><br>    Respondent. | No. CV-24-02800-PHX-SPL<br><br>**ORDER** |

  Before the Court is Petitioner Ahmed Elkhaiat's Verified Petition for Return of Child to Canada pursuant to the Hague Convention on the Civil Aspects of International Child Abduction and the International Child Abduction Remedies Act, 22 U.S.C. § 9001 *et seq*., (Doc. 1), and Respondent Nora Mawashi's Amended Answer (Doc. 24). Having reviewed the parties' briefing for the Verified Petition (Docs. 25, 28, 29), and having held an evidentiary hearing on the matter on February 25, 2025, the Court now rules as follows.

**I.  BACKGROUND**

  Petitioner and Respondent are Canadian citizens and the parents of a one-year-old daughter, L.E. (Doc. 1 at 1–2). Petitioner and Respondent have been married since 2021 and have resided and worked in Toronto, Ontario, Canada throughout their relationship. (*Id.* at 2–3). L.E. was born in Arizona on May 26, 2023, and is a dual citizen of the United States and Canada. (*Id.* at 2).

  Respondent's parents split their time between Queen Creek, Arizona, and Owen Sound, Ontario, and Respondent chose to take maternity leave and give birth to L.E. in

Arizona. (*Id.* at 4). Respondent and L.E. returned to Toronto one month after L.E.'s birth and resided with Petitioner. (*Id.*; Doc. 29 at 7).

Following L.E.'s birth, the parties began experiencing difficulties with their marriage. Respondent provided audio and video recording evidence and credible testimony showing that Petitioner refused to learn how to feed L.E. in January 2024 (Resp't's Ex. 254) and verbally berating Respondent in front of L.E. in December 2023 and January 2024, including once threatening to slap her in the face. (Resp't's Exs. 219, 252, 253). Respondent also alleges that Petitioner would intentionally leave the baby gate open at the top of steep stairs in the couple's Toronto townhome—photos of which were provided to the Court—in an effort to "retaliate" against Respondent. (Resp't's Ex. 251; Tr. of Evidentiary Hr'g, P.M. Session, at 63).

When L.E. was five months old, Respondent expressed an interest in pursuing a higher education program at Arizona State University ("ASU") to Petitioner. (Doc. 1 at 5). The parties dispute whether Respondent applied for the program at that time, and the parties signed a one-year lease for an apartment together in Toronto on December 1, 2023. (*Id.*; Doc. 24 at 5–6). An ASU graduate program accepted Respondent on February 12, 2024; Respondent was interested in switching to another program at ASU and was officially accepted into that program on May 8, 2024. (Doc. 28 at 12–13). Respondent communicated her acceptance to Petitioner. (*Id.*). The parties discussed moving to Arizona, and Respondent applied for visas for herself, Petitioner, and L.E. in May 2024, which were subsequently issued on June 14, 2024. (*Id.* at 15–16).

From March 11, 2024, to April 19, 2024, Respondent and L.E. traveled to Arizona to visit Respondent's parents. (Doc. 29 at 8). On May 26, 2024, after returning to Canada, Respondent traveled with L.E. from Toronto to visit her parents at their home in Owen Sound, Ontario, and allegedly planned to return to Toronto on June 8. (Doc. 1 at 7). Throughout this time, the parties appear to have continued to experience struggles with their marriage. Respondent's parents, Kifah Majid and Sahib Mawashi, testified at the Evidentiary Hearing that they heard Petitioner yelling at Respondent over the phone and

attempting to end the relationship. (Tr. of Evidentiary Hr'g, A.M. Session, at 19–20, 36).

Petitioner took contradictory measures with respect to the move to Arizona. In either April or May 2024, Petitioner asked the parties' real estate agent to find him a one-bedroom apartment in Toronto where he planned to live alone. (Doc. 29 at 14). However, around the same time, the parties continued to discuss and take steps indicating a shared agreement to move to Arizona. On May 14, 2024, Petitioner changed his LinkedIn profile settings to search for employment in the United States. (Doc. 28 at 14). In early June 2024, the parties discussed childcare for L.E. in Arizona, and Petitioner paid for the initial daycare enrollment fees for L.E. at a daycare in Tempe, Arizona. (*Id.* at 16). On June 6, 2024, the parties discussed separating. (*Id.*). On June 15, 2024, Respondent and her father returned to Toronto to retrieve some of her belongings and her passport before returning to Respondent's parents' home in Owen Sound for several weeks. (*Id.* at 17).

Respondent and L.E. were allegedly scheduled to accompany Petitioner to visit his family in Egypt at the end of July but declined to join him prior to the trip. (Docs. 28 at 5; 29 at 17). On July 18, 2024, the parties and L.E. met in Toronto before Respondent and L.E. returned to Owen Sound. (Docs. 28 at 5; 29 at 18). Respondent asserts, and evidence presented at the Evidentiary Hearing supports, that on July 18 and July 19, 2024, Petitioner communicated that he would come help her in Phoenix. (Doc. 29 at 19; Pet'r's Ex. 2 at A.E. 000142). Petitioner traveled to Egypt alone on July 20, 2024. (Doc. 28 at 8). The parties both assert that Petitioner texted Respondent that he did not consent to L.E. being removed from the Toronto area on July 21, 2024. (*Id.*; Doc. 29 at 20).

On August 8, 2024, Respondent and L.E. moved to the Phoenix, Arizona area. (Doc. 29 at 2). Respondent informed Petitioner of the move the next day, and Petitioner returned to Canada on or around August 9, 2024. (Doc. 28 at 10). Petitioner did not contact Respondent or L.E. and stopped providing financial support from approximately August 6, 2024, to September 1, 2024. (Doc. 29 at 23). Petitioner filed a Divorce Application in Ontario on October 8, 2024. (Doc. 28 at 13). Approximately one week later, on October 16, 2024, Petitioner filed the Verified Petition that is now before the Court. (Doc. 1).

## II. DISCUSSION

The International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001 *et seq.*, implements the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11670, 19 I.L.M. 1501 ("Hague Convention" or "Convention"). A federal district court hearing a case under the Hague Convention does not reach the merits of a custody dispute. *See Shalit v. Coppe*, 182 F.3d 1124, 1128 (9th Cir. 1999). Rather, the court "is to determine only whether the removal or retention of a child was 'wrongful' under the law of the child's 'habitual residence,' and if so, to order the return of the child to the place of 'habitual residence' for the court there to decide the merits of the custody dispute, unless the alleged abductor can establish one of a few defenses." *Id*. The petitioner bears the initial burden of showing that the removal or retention was wrongful. 22 U.S.C. § 9003(e)(1)(A). The burden then shifts to the respondent to demonstrate the applicability of any affirmative defenses. 22 U.S.C. § 9003(e)(2).

In determining whether a child has been wrongfully removed from her habitual residence, a court must ask the following questions:

> (1) When did the removal or retention at issue take place? (2) Immediately prior to the removal or retention, in which state was the child habitually resident? (3) Did the removal or retention breach the rights of custody attributed to the petitioner under the law of the habitual residence? (4) Was the petitioner exercising those rights at the time of the removal or retention?

*Mozes v. Mozes*, 239 F.3d 1067, 1070 (9th Cir. 2001).

### a. When did the removal take place?

For the first element, Respondent asserts the relevant date is August 8, 2024 (Doc. 29 at 2), while Petitioner asserts the relevant date of removal is "on or around August 9, 2024." (Doc. 28 at 5). As Respondent removed the child and thus is better positioned to know their travel history, the Court will refer to August 8, 2024, as the relevant date.

///

///

### b. Where was the child habitually resident immediately prior to the removal?

The second element—country of habitual residence—refers to "[t]he place where a child is at home, at the time of removal[.]" *Monasky v. Taglieri*, 589 U.S. 68, 77 (2020) (emphasis added). This is a fact-driven inquiry, and "courts must be 'sensitive to the unique circumstances of the case and informed by common sense.'" *Id*. at 78 (citation removed). Various facts, "including facts indicating that the parents have made their home in a particular place, can enable a trier to determine whether an infant's residence in that place has the quality of being 'habitual.'" *Id*. at 81.

Here, although L.E. was born in Arizona and took an approximately month-long trip to Arizona in spring 2024, it appears that at the time of her removal, she had lived her entire life in Canada. Despite Respondent's arguments otherwise (Doc. 29 at 4), the fact that L.E. has spent a large portion of her otherwise short life in Arizona is irrelevant, as the majority of her time in the United States was after removal. *Nunez v. Ramirez*, No. CV07-01205-PHX-EHC, 2008 WL 898658, at *3 (D. Ariz. Mar. 28, 2008) ("Habitual residence is the place where the children were living before the wrongful removal and retention."). Thus, immediately before her removal on August 8, 2024, L.E. was a habitual resident of Canada.

### c. Did the removal breach the rights of custody attributed to Petitioner under Canadian law?

Petitioner points to Canadian law that provides that "a child's parents are equally entitled to decision-making responsibility with respect to the child." (Doc. 1 at 11); *see also* Children's Law Reform Act, R.S.O. 1990, Ch. C.12, § 20(1).

However, Canada's Children's Law Reform Act further provides that:

> If the parents of a child live separate and apart and the child lives with one of them with the consent, implied consent or acquiescence of the other, the right of the other to exercise the entitlement to decision-making responsibility with respect to the child, but not the entitlement to parenting time, is suspended until a separation agreement or order provides otherwise.

*Children's Law Reform Act*, R.S.O. 1990, Ch. C.12, § 20(4). While Petitioner asserts that

he has applied to the Superior Court of Justice in Ontario, Canada, for determination of parental rights, it does not appear that any court order governing parental rights has been issued. (Doc. 1 at 10).

Respondent and L.E. stayed with Respondent's parents from late May 2024 to early August 2024. (Doc. 29 at 8). The parties do not appear to dispute that Petitioner either consented or acquiesced to Respondent and L.E. staying with Respondent's parents. (Doc. 1 at 7). However, it is unclear whether the parties were truly living "separate and apart" at this time pursuant to Canada's Children's Law Reform Act, or whether this was a mere extended visit to Respondent's parents. Petitioner asserts that Respondent planned to return to Toronto and that the visit to her parents was temporary, that they planned to visit his family in Egypt in July, and that the parties were attempting to reconcile. (*Id.* at 7–8). Respondent disputes this and asserts that the parties both expressed the wish to end their relationship and that the parties never planned for her to return to Toronto; however, this conflicts with her later assertions that Petitioner planned to move to Arizona with her and L.E. (Doc. 24 at 10–11, 19–20). The Court cannot conclude whether these circumstances reflect a true separate living arrangement such that Petitioner's parental decision-making rights are suspended.

Even if Petitioner's decision-making rights were suspended, Petitioner is still entitled to parenting time, which "includes the right to visit with and be visited by the child, and includes the same right as a parent to make inquiries and to be given information about the child's well-being, including in relation to the child's health and education." *Children's Law Reform Act*, R.S.O. 1990, Ch. C.12, § 20(5).

At the very least, L.E.'s removal breaches Petitioner's parenting time rights, as his right to visit with and be visited by the child has been severely limited. *See von Meer v. Hoselton*, No. CV-18-00542-PHX-JJT, 2018 WL 1281949, at *3 (D. Ariz. Mar. 13, 2018) ("[Petitioner] also has lost his ability to parent N.V. or otherwise have physical access to her, other than when he can afford to travel to the United States to spend time with her.").
///

### d. Was the Petitioner exercising those rights at the time of removal?

Lastly, Petitioner must establish that he was actually exercising his parental rights at the time of removal.

Generally, a petitioner has a very low bar to establish that he was exercising his parental rights. *Peyre v. McGarey*, No. CV-23-00350-PHX-DWL, 2023 WL 3726728, at *17 (D. Ariz. May 30, 2023), *reconsideration denied*, No. CV-23-00350-PHX-DWL, 2023 WL 4351544 (D. Ariz. July 5, 2023). The Ninth Circuit has found that conduct including maintaining regular contact with the child and family, visiting the child, and providing financial support meets the minimal burden. *Asvesta v. Petroutsas*, 580 F.3d 1000, 1018 (9th Cir. 2009). The Sixth and Seventh Circuits have held that "a person cannot fail to 'exercise' [his] custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child." *Walker v. Walker*, 701 F.3d 1110, 1121 (7th Cir. 2012) (citing *Friedrich v. Friedrich*, 78 F.3d 1060, 1066 (6th Cir. 1996)). To that end, courts are cautioned against making decisions about the adequacy of one parent's exercise of custody rights, as these matters are "more appropriately reserved for the courts of the child's habitual residence." *Asvesta v. Petroutsas*, 580 F.3d at 1018.

Respondent sets forth many facts alleging the Petitioner did not actively take part in the day-to-day care of L.E., including failing to wake up in the middle of the night to feed her or keep track of her sleeping schedule. (Doc. 29 at 28–29). However, these facts are largely irrelevant to the exercise of parental rights analysis, as considerations of the adequacy of one party's parenting is more appropriately reserved for the habitual residence-country's family courts.

More relevant is Respondent's allegation that starting on August 6, 2024, until September 1, 2024, Petitioner abandoned L.E., cut off financial support, and did not respond to any communications from Respondent. (Doc. 29 at 23). As this alleged "abandonment" occurred two days before the removal, it likely does not constitute a clear and unequivocal abandonment of L.E.—especially considering that Petitioner was in Egypt visiting family at the time. (Doc. 28 at 10). The Verified Petition asserts that Petitioner

communicated regularly with L.E. and Respondent in the weeks leading up to the removal and provided financial support. (Doc. 1 at 7, 12). There is no evidence that Petitioner clearly and unequivocally abandoned L.E. As such, Petitioner has met his burden on this last factor.

### e.  Affirmative Defenses

"Even when a petitioner establishes a prima facia case of wrongful removal . . . the Court may decline to order the child's return if certain 'narrow' exceptions are satisfied." *Asumadu v. Baffoe*, No. CV-18-01418-PHX-DLR, 2018 WL 3957696, at *3 (D. Ariz. Aug. 17, 2018), *aff'd*, 765 F. App'x 200 (9th Cir. 2019). One exception allows courts to decline to return a child wrongfully removed from her habitual residence if the parent consented to or subsequently acquiesced to the child's removal. *Id.* at *4; *Gonzalez-Caballero v. Mena*, 251 F.3d 789, 794 (9th Cir. 2001); *see also Friedrich*, 78 F.3d at 1067 (consent defense must be established by a preponderance of the evidence). Another exception does not require the return of the child if Respondent shows by clear and convincing evidence a grave risk that the child's return would expose her to physical or psychological harm. *von Meer v. Hoselton*, 2018 WL 1281949, at *4 (citing Convention, Art. 13(b); 42 U.S.C. § 9003(e)(2)(A)).

### i.  Consent

In determining whether the petitioning parent consented to removal, courts consider the "subjective intent" of the petitioning parent. *Peyre*, 2023 WL 3726728, at *18. A respondent must unequivocally demonstrate that the petitioning parent consented to the child's indefinite stay, and ambiguous statements or actions do not suffice. *Id.* Consent need not be formal, but courts should contemplate the nature, scope, and any conditions or limitations on any consent. *Id.* Additionally, the petitioning parent's subjective intent is the relevant inquiry; this defense is not applicable where the removing parent honestly believed consent was given if the petitioning parent did not actually consent. *Id.* at *19.

The parties hotly dispute whether Petitioner consented to L.E.'s removal. From Petitioner's telling, he explicitly stated that he did not consent to L.E. traveling to Arizona

and has made every reasonable effort to urge a voluntary return. (Doc. 1 at 8–9). Respondent supplies substantial credible evidence that Petitioner knew of the move months in advance and, at various points, consented to the move and participated in planning for the move. Respondent provides evidence that Petitioner, Respondent, and L.E. had planned to move to Arizona together; the parties obtained a visa for Petitioner to move to Arizona, he began actively searching for work opportunities in the U.S., and he planned to come to the U.S. once he found work; and that he began paying for the child's daycare registration in Arizona. (Doc. 29 at 15–16). Respondent further asserts that Petitioner was long aware of Respondent's relocation plans and did not object to the planned trip to Arizona until Respondent declined to go to Egypt with Petitioner to visit his family. (Doc. 24 at 11). Lastly, Respondent argues that on July 18, 2024, Petitioner stated in person and via text that he would support Respondent in Phoenix. (*Id.* at 12).

However, the parties appear to agree that on July 19, 2024, Petitioner objected to Respondent taking L.E. outside of the Greater Toronto Area ("GTA"). (Docs. 28 at 6; 29 at 19). Petitioner's Exhibit 2 shows text message data that on July 21, 2024, Petitioner told Respondent: "I just wanted to clarify that you do not have my consent implied or given to take [L.E.] anywhere outside the GTA ['Greater Toronto Area']." (Pet'r's Ex. 2 at A.E. 000142). While Respondent asserts that subsequently on August 1, 2024, the parties' families discussed the couple's issues and that their respective families verbally consented to Respondent taking L.E. to Arizona with her to begin her master's degree program, the Court cannot conclude that *Petitioner* consented to removal at this time. (Doc. 24 at 14).

As such, while Petitioner may have indeed been aware and consented to the move at various points, it appears he withdrew that consent on July 21, 2024. Ninth Circuit case law provides that a party cannot revoke consent to removal after the child has been removed. *Gonzalez-Caballero*, 251 F.3d at 794. However, here, Petitioner appears to have revoked any consent he may have provided *prior* to the move.

The Court is unaware of any case law stating that revocation of consent prior to removal is ineffective or that a parent may be estopped from revoking consent when the

other parent has relied on such consent to removal. On the contrary, various other district and circuit courts across the country have determined that equitable defenses are not permitted in cases brought under the Convention. see also *In re Application of Stead v. Menduno*, 77 F. Supp. 3d 1029, 1037 (D. Colo. 2014) ("The equitable doctrines invoked by respondent are not mentioned in the Convention and are therefore not properly brought as defenses to a petition for return of the child."); *Karpenko v. Leendertz*, 619 F.3d 259, 265 (3d Cir. 2010) ("[W]e are not aware of any authority that would support dismissal of a Hague Convention petition on grounds of unclean hands . . . . The conduct of the parents, other than the claim of abduction or retention, is not mentioned in the Hague Convention except to the extent that [it] may be relevant to one of the affirmative defenses."); *Katona v. Kovacs*, 148 F. App'x 158, 161 (4th Cir. 2005) ("Finally, we have found nothing to support the district court's application of the doctrine of equitable estoppel to the Convention."). This Court agrees that ICARA clearly limits affirmative defenses to the "narrow exceptions" provided under the Convention. *Menduno*, 77 F. Supp. 3d at 1037. Thus, the Court finds that Respondent has not raised a valid consent defense.

### ii. Grave Risk

For the risk of psychological or physical harm exception to apply, the risk shown must be "grave, not merely serious." *von Meer*, 2018 WL 1281949, at *4 (citing *Goudin v. Remis*, 415 F.3d 1029, 1036 (9th Cir. 2005)). This is generally a very high bar to meet. *Id*. Under the Convention, 'grave risk of harm' exists in two situations:

> (1) when return of the child puts the child in imminent danger prior to resolution of the custody dispute (e.g., returning child to a zone of war, famine, or disease); or (2) where there is serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection.

*Nunez*, 2008 WL 898658, at *5. "Spousal violence may also 'establish a grave risk of harm to the child, particularly when it occurs in the presence of the child.'" *Colchester v. Lazaro*, 16 F.4th 712, 718 (9th Cir. 2021) (citation omitted).

Respondent asserts various facts to support her grave risk argument. Respondent

alleges that Petitioner has engaged in a long course of verbal abuse, repeatedly threatened to divorce her, and once verbally threatened to slap her in the face. (Doc. 29 at 27–28). The Court further reviewed audio evidence from various dates in which Petitioner verbally berated and yelled at Respondent, at least one time in L.E.'s presence. (Resp't's Exs. 219, 252, 253, 254). This conduct, which does not include any allegations of physical violence, does not rise to the level to support a grave-risk claim. *See Peyre*, 2023 WL 3726728, at \*20 ("Bumping up against one's spouse a few times in an aggressive manner, while improper, is not the sort of conduct that could support a grave-risk claim.").

Respondent further asserts that returning L.E. to Petitioner risks placing the child in unsafe conditions. (Doc. 29 at 28). She alleges that Petitioner has been absent from daily routines and caregiving tasks, refused to learn how to feed L.E. or respond to L.E. crying in the night, did not know how to secure the car seat and on two occasions did not buckle L.E. in, and dangerously left the baby gate open near steep stairs in the couple's Toronto townhome, in an effort "to make [Respondent's] life hell." (*Id*. at 28–29; Tr. of Evidentiary Hr'g, P.M. Session, at 63).

Generally, "[s]uch behavior, if proven, presents a question of suitability as a parent, which goes to the issue that will be before the family court in the country of [L.E.'s] habitual residence." *von Meer*, 2018 WL 1281949, at \*4. To that end, Respondent has provided no evidence or argument that the Canadian courts are unwilling or unable to protect L.E. from potential unsafe conditions or other harm. *See Friedrich*, 78 F.3d at 1068 ("[W]e acknowledge that courts in the abducted-from country are as ready and able as we are to protect children. If return to a country, or to the custody of a parent in that country, is dangerous, we can expect that country's courts to respond accordingly."); *Nunez*, 2008 WL 898658, at \*5 (evidence of abuse to the removed child insufficient to establish grave risk exception because there was insufficient evidence that the habitual residence country's courts would not protect the children from abuse). The Court finds that Respondent has not established a valid "grave risk" defense.

However, in considering whether the child faces a grave risk prior to the home

country court's determination, courts may also consider ameliorative measures that can reduce potential risks associated with a child's repatriation and make possible the safe return of a child. *Golan v. Saada*, 596 U.S. 666, 679 (2022), *judgment entered*, 213 L. Ed. 2d 1107 (June 29, 2022); *see also Keen v. Bowley*, No. 8:23-CV-02333-JWH-JDE, 2024 WL 3259040, at *51 (C.D. Cal. July 1, 2024) (finding no grave risk but exercising discretion to "consider what measures might ensure that the Baby's return is as smooth and drama-free as possible" and imposing ameliorative conditions).

Here, the Court has significant concerns about L.E.'s safety and the potential for psychological harm prior to any Canadian court's custody disposition. The evidence indicates that Petitioner is ill-equipped to care for infant L.E. Specifically, the Court is alarmed by the allegations that Petitioner failed to close the baby gate at the top of a precipitous staircase pictured in Respondent's exhibits—a fall from which almost certainly would result in L.E.'s death or critical injury—in order to upset Respondent. (Resp't's Ex. 251; Tr. of Evidentiary Hr'g, P.M. Session, at 63). Additionally, the Court finds the audio evidence in which Petitioner refused to learn how to feed the child disconcerting. (Resp't's Ex. 254). Moreover, Respondent has been L.E.'s primary caregiver—and for several months prior to the removal, sole parental caregiver—her entire life. Ordering Respondent to transfer L.E. to Petitioner's custody would refute one of the primary purposes of the Convention: to preserve the status quo that existed before a child's removal prior to a custody disposition in the home country's courts. *Ciampa v. Nichols*, No. 8:24-CV-02556-DOC-ADS, 2025 WL 521009, at *2 (C.D. Cal. Feb. 18, 2025) ("The primary purpose of the Hague Convention was to preserve the status quo that existed before a child's removal, and to deter would-be abductors from removing children to other jurisdictions in search of a more sympathetic court.") (citing Pub. Notice 957, 51 Fed. Reg. 10494, 10505 (1986)).

While the Court is confident that the Canadian family courts will be able to properly resolve any custody dispute in L.E.'s best interests, the Court is disinclined to put L.E.'s safety at risk or disrupt the status quo of L.E.'s life in the meantime by ordering Respondent to deliver L.E. to Petitioner's custody.

### III. CONCLUSION

The Court finds that Petitioner has made the required showing under the Convention for a return of L.E. to Canada. Respondent wrongfully retained L.E. from her last settled habitual residence in Canada, thereby breaching Petitioner's parental rights under Canadian law. The Court also finds that while Respondent has not established an applicable exception to the Convention's return mandate, the Court finds ameliorative mitigation measures appropriate—namely, Respondent accompanying L.E. to Canada unless the parties reach an alternative agreement, or a Canadian court issues a superseding order—pending the Canadian court's determination of custody.

"This Court's ruling is narrow; it does not decide who should have custody of [L.E.], which location is in [L.E.'s] best interest, or who is the better parent." *von Meer*, 2018 WL 1281949, at *6. It is limited only to deciding that L.E. will be returned to Canada, and that the Canadian courts are the appropriate forum under the Hague Convention to resolve any custody issues. *Id.* Accordingly,

///

///

///

///

**IT IS ORDERED** that Petitioner Ahmed Elkhaiat's Verified Petition (Doc. 1) is **granted**.

**IT IS ORDERED** that Respondent shall return L.E. to Canada **within 30 days** of any further order of the Canada family court regarding the determination of a custody arrangement or related proceedings.

**IT IS FURTHER ORDERED** pursuant to Article 26 of the Convention and 22 U.S.C. § 9007 that Petitioner shall submit his request for reasonable attorneys' fees and costs associated with this action no later than **14 days from this Order**. Any such motion must comply with LRCiv 54.2 and Federal Rule of Civil Procedure 54(d). The Court shall rule on and order any reasonable costs and fees upon full briefing of the issue.

Dated this 5th day of March, 2025.

Honorable Steven P. Logan
United States District Judge